

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,  )
                            )
      v.  )    Case No. 1:14-mj-652
                            )
AMAR ENDRIS                 )
                            )
    Defendant.              )
                            )

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

Your affiant, Special Agent Adam C. Pool of the Federal Bureau of Investigation (hereafter FBI), being duly sworn, states as follows:

## INTRODUCTION

1.      This affidavit is submitted in support of a criminal complaint  for AMAR ENDRIS

2.      Based on the facts contained below, your affiant submits there is probable cause to believe that on or about December 17, 2014, in Fairfax County, Virginia within the Eastern District of Virginia, Amar ENDRIS ("ENDRIS"), did knowingly and unlawfully possess and receive after having been shipped and transported in interstate or foreign commerce, a firearm with an obliterated serial number, to wit: a Glock 9MM semiautomatic pistol, in violation of Title 18, United States Code, Section 922(k).

3.      I have been an FBI Special Agent since March 2005. Since that time I have been assigned to a counterterrorism squad operating out of the New York and Washington, D.C., Field Offices. I am an investigative or law enforcement officer of the United States, within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

4.      The facts set forth in this affidavit are based on my personal knowledge and review of records, documents, and other physical evidence obtained during this investigation, as well as information conveyed to me by other law enforcement officials and private persons. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.

5.      Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, it does not include each and every fact observed by me or known to the government. I have set forth only those facts necessary to support a finding of probable cause.

## PROBABLE CAUSE

6.      In or about March 2014, ENDRIS first met with an FBI Confidential Human Source (hereafter CHS).[1] Since the initial meeting, ENDRIS has developed a friendship with the CHS. The CHS has assisted the FBI with numerous criminal enterprise investigations that have led to multiple convictions. At no time has the CHS been cooperating with the FBI in order to mitigate his own criminal penalties. The CHS has received monetary compensation for working with the FBI. To date the CHS has received approximately $170,000.00 from the FBI for his assistance to law enforcement. The CHS has not provided any information that was later found to be false or misleading and the CHS is believed to be reliable. Many of the conversations with ENDRIS described in this criminal complaint were consensually recorded by the CHS.

---

[1] Regardless of his/her true gender, the CHS will be referred to in the masculine gender.

7.    On or about June 6, 2014, ENDRIS told the CHS that he wanted to purchase a firearm. ENDRIS stated that he wanted an "AK-47" or an "AR", and a pistol. ENDRIS said he wanted to train himself on these pistols so he will be able to operate them when he goes to Syria. In various conversations with the CHS previously, ENDRIS expressed a desire to travel to Syria to fight in the conflict there. ENDRIS also expressed to the CHS that he wanted a firearm for self-defense.  ENDRIS was assaulted by an individual named Bryan LNU, and ENDRIS is still fearful of this individual. ENDRIS also asked the CHS if he would get in trouble if he shot someone in self-defense. ENDRIS pointed his finger at someone out of the window and asked the CHS if he thought that ENDRIS could hit them with a shot from a pistol at that distance. ENDRIS stated that he currently has $200.00, and in addition, would "bust some moves," to earn the money to purchase a firearm. ENDRIS then used the internet to locate upcoming gun shows in Virginia and found that two gun shows were taking place in the month of June. ENDRIS made arrangements with the CHS to attend these shows.

8.    On or about June 6, 2014, ENDRIS asked the CHS to drive him to Dicks Sporting Goods to look at pistols. Once there, ENDRIS looked at the pistols for sale. There was no employee there to let them handle the firearms, but ENDRIS had the CHS take a picture of ENDRIS holding a pellet gun. ENDRIS stated that he could not wait to get a real gun and that he could not wait to go to battle.

9.    On or about July 11, 2014, ENDRIS spoke to the CHS about a pistol he was planning to buy from a local sporting goods store. ENDRIS described the pistol as a 9mm pistol that sometimes jams. ENDRIS said that the 9mm pistol is broken but fixable. ENDRIS said that for other firearms for sale in the store you need "papers," but to buy this pistol you do not. The CHS, ENDRIS, and a third individual called "Mo" drove to this sporting goods store which was

located in Falls Church, Virginia where ENDRIS and the CHS looked at the 9mm pistol but ENDRIS decided not to buy it.

10.     On or about July 2, 2014, ENDRIS and the CHS met at a local mosque in Falls Church, Virginia. ENDRIS and the CHS discussed events involving ISIS[2] that were unfolding in Syria and Iraq. ENDRIS told the CHS that he hoped ISIS takes over Ethiopia and Somalia. During this conversation, ENDRIS told the CHS that he wanted to obtain a pistol and that he wanted to do it illegally so that the government did not know that he had the gun.

11.     On or about July 12, 2014, ENDRIS showed the CHS a video by Abu Amriki, also known as Adam Gadhan, who is an American senior operative, cultural interpreter, spokesman and media advisor for the Islamist group al-Qaeda. In the video, Gadhan said in this video that everyone needs to fight Jihad, that if you can't travel, you can fight Jihad where you are. ENDRIS told the CHS to watch a part of the video closely and pointed out that it said, if you can't get an AK, get a knife, and that you don't have to come "here" to fight Jihad.

12.     On or about September 10, 2014, the CHS met ENDRIS in Alexandria, Virginia. The CHS stated that ENDRIS wanted the CHS to drive him and a friend to an unnamed individual's home in Washington D.C. to purchase a pistol for $250.00. According to ENDRIS, the unnamed individual was an associate of ENDRIS's friend. Upon meeting ENDRIS, the CHS told ENDRIS that the CHS was uncomfortable being involved in the transaction because the CHS was a convicted felon. ENDRIS told the CHS that the transaction was going to take place in Alexandria, Virginia and asked the CHS again to drive him.  The CHS again declined.

_____

[2] ISIS or the Islamic State of Iraq and Syria, also referred to as the Islamic State of Iraq and al-Sham is a designated Foreign Terrorist Organization that is active in Iraq and Syria among other locations.

Ultimately ENDRIS was unsuccessful in purchasing this pistol because he was robbed of the $250 during the transaction.

13.  On or about October 1, 2014, the CHS and ENDRIS had a telephone conversation in which the CHS asked ENDRIS if he was interested in purchasing a pistol from an associate of CHS's. This conversation was consensually monitored. ENDRIS asked the CHS how much the pistol cost. The CHS told ENDRIS that the pistol cost $300.00. ENDRIS told the CHS that "yeah" he wanted the pistol. The CHS told ENDRIS that the pistol did not have the serial number on it because it was "scratched off" and that you are not supposed to have the firearm because it is "illegal". ENDRIS told the CHS not to talk about this on the phone.

14.  On or about October 1, 2014, during a consensually monitored meeting, ENDRIS asked the CHS what type of pistol the CHS's associate was selling. The CHS told ENDRIS that it was a Glock 9mm. ENDRIS asked what "number" the Glock was. The CHS responded that he did not know. The CHS asked ENDRIS if he had the money to buy the pistol. ENDRIS said that he did have the money and he did not want to buy the weapon at that time because he was travelling to Ethiopia soon. ENDRIS said that when he does buy the weapon he wants a receipt from the seller so that no one will think he stole it. ENDRIS told the CHS to ask the seller what type of Glock he was selling. ENDRIS asked if the pistol was "clean." CHS told ENDRIS that the serial number was "scratched" off, and that you can't have a pistol with the serial number scratched off. ENDRIS said for $250.00 he would buy the pistol and that you can get a 30 round magazine to fit Glocks.

15.  On or about October 5, 2014, ENDRIS attempted to exit the country to fly to visit family in Ethiopia. However, ENDRIS was not allowed to board the plane. On or about October 11, 2014, ENDRIS again attempted to exit the country to visit Ethiopia and was once again not

allowed to board the plane. From October 11, until approximately December 13, 2014, ENDRIS remained in sporadic contact with the CHS through social media. During this time, ENDRIS continued to tell the CHS that he was actually in Ethiopia and was unsure when he was going to return. On or about December 4, 2014, ENDRIS contacted the CHS via social media and asked if the CHS's associate still had the pistol. On or about December 10, 2014, ENDRIS contacted the CHS via social media and stated that he would be back on December 13, 2014. On or about December 14, 2014, ENDRIS contacted the CHS again and told the CHS that he still wanted to purchase the pistol and that he was willing to pay $250.00 for the pistol. On or about December 15, 2014, ENDRIS placed a telephone call to the CHS. This telephone call was consensually recorded. During this call, the CHS told ENDRIS that the seller wants $300.00, or the equivalent, for the pistol and that the serial number of the pistol is "scratched" off. ENDRIS told the CHS that that was okay. ENDRIS told the CHS that he would pay $200.00 for the pistol. The CHS told ENDRIS that the seller will only take $300.00 for it. ENDRIS asked why the price for the pistol was raised from $250.00 to $300.00, but he ultimately agreed to pay $300.00 for the pistol.

16.     On or about December 16, 2014, the CHS placed a consensually monitored phone call to ENDRIS. The CHS asked ENDRIS if he had $300.00 to purchase the pistol. ENDRIS stated that he did have $300.00 to purchase the pistol. The CHS told ENDRIS that he would meet him in the morning at approximately 11:00 am. The CHS told ENDRIS that he needs to be sure he wants the pistol and has the money because his associate does not want to risk transporting the pistol because it is illegal to have a pistol with the serial number scratched off, if ENDRIS does not want the weapon. ENDRIS then asked if the sale of the weapon was a "set-up." The CHS told ENDRIS that it was not a set-up and that after the deal is completed they

should not be driving around with the pistol. ENDRIS then agreed to meet with the CHS and the seller at 11:00 am. ENDRIS told the CHS to bring "everything."

17.     On or about December 17, 2014, ENDRIS and the CHS drove to a pre-determined meeting place where they met with the CHS's "associate" who was, in fact, an FBI agent. The associate approached the vehicle that ENDRIS and the CHS were in and asked if ENDRIS had the money for the gun. ENDRIS initially sought to pay less than $300 for the gun, however after discussing the price, he agreed to pay the $300. At that point ENDRIS counted out $300 in $20 bills and gave it to the associate. The associate then retrieved a plastic bag containing a Glock 9mm semiautomatic pistol with an obliterated serial number and with a firing pin that had been filed down from his vehicle and gave it to ENDRIS. I am aware, from my training and experience, that Glock firearms are manufactured in Austria. The Glock 9mm that was given to ENDRIS had the words "Made in Austria," stamped on it. Therefore, it had traveled in interstate or foreign commerce at some point prior to being given to ENDRIS.

18.     After receiving the gun, ENDRIS placed it in a backpack initially, but the associate requested that he check the gun to make sure it was what he wanted. At that point ENDRIS looked at the weapon, examined the barrel of the gun using a flashlight and then told the associate that it looked okay. ENDRIS asked the associate if the gun worked and the associate told him that it did. The associate then left ENDRIS and the CHS in their vehicle. ENDRIS then exited the vehicle with the gun and placed the pistol inside of the trunk of the CHS's vehicle. ENDRIS was subsequently placed under arrest for possessing and receiving a firearm with an obliterated serial number.

## CONCLUSION

19.    Based on the foregoing, your affiant submits there is probable cause to believe that on or about December 17, 2014, in Fairfax County, Virginia, within the Eastern District of Virginia, AMAR ENDRIS, did knowingly and unlawfully possess and receive after having been shipped and transported in interstate or foreign commerce, a firearm, to wit: a Glock 9MM semiautomatic pistol with an obliterated serial number, in violation of Title 18, United States Code, Section 922(k). Accordingly, your affiant respectfully requests that the Court issue a criminal complaint for ENDRIS.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Adam C. Pool
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me this 18th day of December, 2014.

/s/
Ivan D. Davis
United States Magistrate Judge