1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA     .     Criminal No. 1:15cr44
                             .
      vs.                    .     Alexandria, Virginia
                             .     July 31, 2015
AMAR ENDRIS,                 .     9:06 a.m.
                             .
          Defendant.         .
                             .
. . . . . . . . . . .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          JOHN T. GIBBS, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           KEVIN R. BREHM, ESQ.
                             NICHOLAS J. XENAKIS, ESQ.
                             Office of the Federal Public
                             Defender
                             1650 King Street, Suite 500
                             Alexandria, VA 22314


<u>ALSO PRESENT</u>:             SA JONATHAN SIKORSKI


OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595


(Pages 1 - 26)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1                    P R O C E E D I N G S

2            THE CLERK:  Criminal Case 15-44, United States of

3    America v. Amar Endris.  Would counsel please note their

4    appearances for the record.

5            MR. GIBBS:  Good morning, Your Honor.  John Gibbs on

6    behalf of the United States.  John Sikorski with the FBI is

7    also present.

8            THE COURT:  Good morning.

9            SA SIKORSKI:  Good morning.

10            MR. BREHM:  Good morning, Your Honor.  Kevin Brehm

11    along with Nick Xenakis on behalf of Mr. Endris, who's in

12    custody and should be entering the courtroom any moment.

13            THE COURT:  All right.

14                         (Defendant present.)

15            MR. BREHM:  Mr. Endris is now present, Your Honor.

16            THE COURT:  All right.  Mr. Brehm, have you had

17    enough time to go over the pre-sentence report yourself and

18    with Mr. Endris?

19            MR. BREHM:  I have, Your Honor, but there is pending

20    a motion for new trial.  I don't know if you wanted to address

21    that first.  If so, Mr. Xenakis would be the person to handle

22    that.

23            THE COURT:  I've read the pleadings on this case.

24    I'm going to deny the motion.  There was sufficient evidence

25    presented during the trial to establish your client's guilt

1    beyond a reasonable doubt.  There is not any compelling

2    evidence of entrapment, and any objection to the trial has been

3    overruled.

4         I don't see any new issue that was raised.  There's

5    no change in the law that I am aware of or that was brought to

6    my attention, and so I don't think there's anything there, so

7    the motions are denied.

8         MR. BREHM:  Thank you.  I just want to make sure that

9    that matter was clearly resolved first.

10        THE COURT:  I have, yeah.

11        MR. BREHM:  I appreciate that.

12        So getting back to your question, and I apologize,

13   Your Honor, yes, I have reviewed the pre-sentence report with

14   Mr. Endris.  A copy has been provided to him.  Your Honor

15   probably noted that the pre-sentence report reflects the one

16   objection I had made to calculation of the guidelines, and I

17   think the probation officer did an excellent job summarizing.

18        THE COURT:  Your client would qualify as a prohibited

19   person even if the, that was not charged as an actual crime.

20   There's adequate -- more than adequate evidence of his use of

21   drugs, and that would make him a prohibited person to have a

22   firearm.

23        MR. BREHM:  I believe that the evidence did show that

24   he would come under that classification.  Our position was that

25   for purposes of the guidelines, we believe that the -- when you

4

1    look at a base offense level as opposed to specific offense

2    characteristics, the base offense level is supposed to reflect

3    the crime of conviction, and he was not convicted of being a

4    drug abuser in possession of a firearm.  Instead, it was the

5    other type of illegal question, that is, the firearm in

6    question itself was illegal, that anyone who possessed it,

7    whether a drug abuser or prior felon or not, could not possess

8    that type of gun.

9         THE COURT:  Yeah, but it's an aggravating factor that

10   is properly considered in looking at the total offense conduct.

11   It's relevant conduct in my view, and so I think that the

12   Probation Office calculated that correctly.

13        MR. BREHM:  Thank you, Your Honor.

14        THE COURT:  All right.  So there are no other factual

15   corrections, changes, additions, or deletions you want made to

16   the report itself?

17        MR. BREHM:  That's correct, Your Honor.

18        THE COURT:  All right.  As you know then, the

19   Probation Office calculated the offense here as a level 18.

20   The defendant has a criminal history of I.  That establishes an

21   advisory range of 27 to 33 months.  There's a one- to

22   three-year period of supervised release.  The fine range is

23   $6,000 to $60,000, and there's a $100 special assessment.

24        So those figures are not being disputed at this

25   point, having overruled the objection to the offense level,

1    correct?

2             MR. BREHM:  That is correct, yes, Your Honor.

3             THE COURT:  All right.  We all know that there have

4    been some aggravating factors that have occurred since the

5    defendant was convicted.  The government has provided the

6    Court, and I assume, Mr. Brehm, you've seen copies of this,

7    too, with pictures of -- that were taken off of, as I

8    understand it, his cell phone and text messages.  The pictures

9    are extremely concerning.  They show the defendant -- two of

10   them show the defendant holding a firearm, pointing it at the

11   camera.  It looks like it's probably a selfie.

12            In fact, in the second picture, there may be two guns

13   in his hand, it appears that way, and then in the remaining

14   first -- and I'll have this made a part of the record -- I

15   think there are three identical pictures of two firearms.  One

16   appears to be all black, and one appears to be silver, unless

17   the lighting is shining on it in a strange fashion, and these

18   images include some comments.

19            It does appear as though the defendant may have been

20   attempting to actually buy and sell firearms.  That's an

21   extremely aggravating post-conviction factor.

22            You, Mr. Brehm, raised in your memo that was filed

23   yesterday your concerns about the manner in which the defendant

24   was arrested.  I have spoken with the arresting deputy marshal,

25   and he has advised the Court that what happened was your client

1   did not raise both hands when he was exiting his vehicle, as he

2   was instructed by the deputy.  The deputy was wearing a clear

3   indication he was law enforcement, and that because the deputy

4   knew that when your client was first arrested in this case, he

5   had a knife in his right pocket and his right hand did not come

6   up, that the officer, appropriately concerned about his safety,

7   used the force that was used to push your client down to the

8   ground, I would think you call it a take-down, and that's how

9   your client's eye was injured.  That's what the Court has been

10  told.

11          In any case, it's unfortunate your client got hurt.

12  It was not a very serious injury.

13          But of much more concern to the Court is these

14  photographs and these text messages, which I think you're going

15  to need to, if you can, explain to the Court.

16          MR. BREHM:  Well, I'm not sure I can explain them in

17  a factual sense, although I can say with my limited knowledge,

18  I don't believe those photographs were taken at his residence

19  or are items, as far as the firearms, are items that he himself

20  owned or possessed other than at the time the pictures were

21  taken.

22          And I believe, as you mentioned and it's my

23  understanding in looking at the photographs, there appear to be

24  two firearms.  There's multiple photographs, but I think it's

25  the same two firearms that are depicted each time, and I think

7

1   the photographs appear to be taken the same day as well.

2         THE COURT:  But here's my problem:  Your client was

3   convicted in April, right, in April?

4         MR. BREHM:  Yes.

5         THE COURT:  The date that these apparently were done

6   is June 27.  That means while he's on bond, having been

7   convicted of an offense involving firearms, he's still messing

8   around with firearms.  That's a real serious concern for the

9   Court.

10        MR. BREHM:  As it should be.  And what I can address

11  is I believe that's the, the reflection of the different

12  problems he has that have been identified in various pleadings

13  and evaluations.  Not only has he just recently turned 20 and

14  so to some extent has youthful indiscretions, but to compound

15  that, despite the age, he has some very serious mental health

16  issues that I believe are reflected in this kind of conduct.

17        We don't see, to my knowledge, while on bond or

18  previously him actually using firearms in any way to threaten

19  or harm anyone.  Instead, it seems very unfortunate, and I

20  think the Court has a right to be concerned, he's acting in a

21  way that immature, I would say usually teenagers, but he's just

22  turned 20, but he's, I think, in many ways, in his mental

23  capacity far younger than even 20, do these things.

24        They take selfies or other people take pictures of

25  them with things that they're, like, some kind of showing off,

1   and they put them on YouTube or they put them on Facebook, and

2   they're either depicted with a pile of cash or wearing giant

3   necklaces or holding a gun, things like that, and that doesn't

4   necessarily depict what their conduct is going to be.

5          It depicts in my mind a very immature mental state

6   that doesn't realize that that depiction alone, although it

7   might impress, you know, their peers and make them look cool or

8   whatever, is the kind of thing that's going to exactly get the

9   result that you have and most people have is that, gee, I'm

10  kind of worried.  What's going on here?

11         THE COURT:  Well, that might be the case if he had

12  not been prosecuted already, but he's been prosecuted now.

13  He's been convicted.  He's awaiting sentencing.  And to

14  continue to engage in that kind of conduct is so indicative at

15  this point of a problem with rehabilitation and so problematic

16  in terms of a deterrence that it's going to definitely affect

17  the sentence in this case.

18         MR. BREHM:  Well, and I understand, and I think the

19  point I'm trying to make is that that conduct after being

20  convicted clearly is inappropriate but also reflects his mental

21  state that I'm not sure how fully he comprehended the fact that

22  having a verdict returned against him and not having been

23  sentenced yet meant he wasn't supposed to even hold guns up at

24  some friend's home or wherever and have pictures taken, which

25  may be the extent of what happened here.

1          Clearly, you and I recognize that that's totally

2   inappropriate and actually illegal under the law.  Whether he

3   comprehended that or not I'm not certain based on what we know

4   about his mental state and my dealings with him.

5          Obviously, at some point in time, it seems we're

6   asking sooner than later, he needs to get mental health

7   treatment.  For whatever reason, that hasn't really happened

8   while he's been on bond, although we thought it might.  We're

9   making efforts to try to find appropriate treatment.  There is

10  some insurance coverage that might help with that.

11         He seems like the kind of individual that I think

12  based on what I've seen in other clients, ultimately is going

13  to benefit from being in some kind of a group home situation so

14  he can get mental health and drug abuse problems taken care of

15  and then be able to transition into the community.

16         You've seen from the history and the parents'

17  letters, which I thought were very compelling, he's been trying

18  to find work.  He applies for jobs, he gets jobs, and then he

19  can't hold them, and he can't hold them, I think, because of

20  some of these intellectual or mental health problems he's

21  having, but he's actually trying in some respects to be

22  productive, but at the same time, he's an extremely immature

23  person not only just in chronological age but in his mental

24  status, and he's doing what I would tell my kids is a

25  knucklehead thing -- to actually take selfies of you either,

1    either, you know, drinking from a bottle of liquor or flashing

2    jewelry, whatever.

3         These, these are things that immature, often teenage

4    people do that don't necessarily reflect what their conduct is

5    going to be, but they're still wrong, and they still give the

6    impression that you get and most of the people in the community

7    get, which is what's going on with this person?  Well, we

8    already know to some extent what's going on, and that is that

9    he has certain problems that need to be address and apparently

10   haven't yet and need to be at some point.

11        So certainly at some point, he's going to be on

12   supervision.  We're asking sooner than later.  Well, when he

13   is, he's going to need treatment.

14        The parents are here as well as the aunt and uncle,

15   who've been supportive, and they've expressed concerns that

16   you're aware of about what's going on with him.  They're not

17   sure, either, and it's frustrating to them.  They want him to

18   get some kind of treatment.  They've told me again today, as

19   they've told me in the past, that they're willing to have him

20   in the home if he's getting treatment and he's going to

21   treatment, because they want to find out what's going on.

22        I thought it was very powerful that they themselves

23   expressed the kind of personal guilt they did in the letters

24   that a lot of his problems, they think, are their fault in

25   terms of how he was brought up and all, and I commend them for,

1    you know, being willing to say that, but obviously, some of

2    those things are beyond their control.  If he has certain

3    actual mental health issues, it's not that they created those,

4    but if they exist, they need to be addressed.

5         So our biggest concern is, is that we see these

6    things that he's doing that he shouldn't be doing, but I don't

7    see then going beyond that, where he's actually out there, you

8    know, committing crimes, where he's actually robbing people,

9    things like that.  He says a lot of things that immature people

10   do to show off, and he says a lot of different things about why

11   I want a gun, whatever.  There's no consistency to it that he's

12   really going to carry something out.

13        But still what he does should give concern to the

14   Court and others what's going on with him, and that's what

15   needs to be determined.  What -- we know already from

16   evaluations what some of the problems are.  They need to be

17   addressed.

18        Our concern is that a lengthy period of incarceration

19   we don't know is really going to address that.  We still think

20   he still needs to maintain ties with his family and the

21   community to help that kind of process along, and that's what

22   we're asking the Court to consider.

23        THE COURT:  All right.  Mr. Gibbs?

24        MR. GIBBS:  Thank you, Judge.  You know, to start

25   with, Judge, I think the government shares the Court's concerns

1    about some of these latest incidents.  Obviously, receiving

2    these photos in the last few days where the defendant, having

3    been on release post-conviction, apparently showed these

4    parents -- or his parents saw these pictures, became so upset

5    and so scared that they contacted Probation and said they no

6    longer wanted to be responsible for him, that's a huge concern,

7    and ultimately, the unanswered question for us is when the

8    defendant left his house, he was gone for a period of about two

9    days.  We don't know much of anything about his whereabouts.

10          As the Court indicated, these photographs appear to

11   show and the FBI believes they do show actual guns.  These are

12   not toy guns.  And he's holding two of them.

13          We don't know where these pictures were taken.  We

14   don't know where these guns are.  We don't know how he got

15   these guns.

16          And again, this takes us back to the original

17   problem, which is this individual seems to have this incredible

18   fascination with guns that is so powerful, having been

19   convicted, having been on bond, where he was, you know,

20   instructed that he cannot have any guns, cannot possess guns,

21   he apparently went out, got his hands on two, and then engaged

22   in these text messages where, as the Court indicated, he talked

23   about trying to get guns.

24          So in terms of the sentence, that has to factor into

25   it, and, you know, the Court has indicated that, that the

1     enhancement that's in the pre-sentence report is appropriate,

2     so he would be facing a 27- to 33-month sentence.  In terms of

3     the 3553(a) factors, a sentence within that range for

4     deterrence and punishment, we feel, would be appropriate if

5     none of this conduct has happened, but now the problem is

6     there's the 3553(a) factor about protection of the public.

7              And regardless of the defendant's mental state,

8     regardless of, you know, what that state is, the fact is he is

9     very erratic, and he just has this fascination with guns, and a

10    sentence at the top of the guideline, we believe, is

11    appropriate, and we would ask for that sentence in large part

12    to protect the public.

13             Now, in terms of that sentence, we certainly have no

14    objection if there is any kind of mental health treatment that

15    can be imposed or that he can be in a facility where that's

16    available to him.  That obviously, in our view, would be a good

17    idea.

18             His parents had asked about a facility near here so

19    they can visit him.  Obviously, we understand that that can

20    only be a recommendation, BOP can't be ordered to do that, but

21    we wouldn't object to that, either.

22             But in terms of a sentence, Your Honor, we would ask

23    for a sentence at the top of the guideline for all the reasons

24    that I've outlined and for the reasons that the Court has

25    alluded to.  So thank you.

1          THE COURT:  All right, thank you.

2          Mr. Brehm, do you -- and I'm not going to ask you to

3  reveal any attorney-client privileged conversations, but did

4  you speak with your client before coming to court today so that

5  he can explain to the Court what these photographs depict?  In

6  other words, did you talk to him about, you know, where do

7  these come from?  Were they Photoshopped, or are they real?

8          Do you want to give the Court anything additional

9  that can help us understand what happened here?

10          MR. BREHM:  I didn't talk about those details.

11  Instead, Your Honor, once I became aware of it, it was just in

12  the last few days --

13          THE COURT:  I know.

14          MR. BREHM:  -- and was able to meet with him just a

15  few days ago at the detention center, I wanted to make sure

16  that he understood now and he should have understood before

17  that that kind of conduct is just not permissible.

18          In many ways, in his situation at least, it first of

19  all is illegal, and secondly, it's just not permissible

20  generally because of the concerns that have been expressed here

21  when you see people with those kind of photographs depicting

22  them holding certain items.

23          THE COURT:  Right.

24          MR. BREHM:  So that was the concern I had was

25  addressing his awareness of how inappropriate that that conduct

1    was.  Again, because of already having dealt with him and

2    seeing the evaluations, I realize that maybe there was

3    something where he just simply didn't get it, so to speak, that

4    that type of conduct is generally improper and, more

5    specifically for him, illegal, and so that was the focus of my

6    comments, just having recently seen the photographs, addressed

7    them that way.

8            THE COURT:  All right.  Mr. Endris, come up to the

9    lectern.  Mr. Endris, this is your chance to say anything you

10   would like the Court to consider before sentence is imposed.

11           THE DEFENDANT:  I would like to apologize to

12   everybody in this courtroom, and I would like to thank

13   everybody that took their time in my trial.  Thank you.

14           THE COURT:  Mr. Endris, do you want to explain to the

15   Court where those photographs come from?  You've seen them.

16   You don't have to if you don't want to.

17           MR. BREHM:  You don't have to.  You still have to

18   stand there.

19           THE COURT:  Do you want to explain, or do you not

20   want to explain?

21           THE DEFENDANT:  No.

22           THE COURT:  You do not, all right.

23           Well, it's difficult to sentence a defendant like

24   this with -- without being aware of what's going on in the

25   world today.  Right now in Arizona, there's that horrible

1    capital trial going on about the movie theater shooting, with

2    some facts that are not that different from this case.  A

3    person with mental illness got ahold of weapons and committed a

4    horrible offense and is facing the dealt penalty.

5         And I heard some of the broadcast of the sentencing

6    hearing, apparently they can broadcast those state proceedings,

7    and hearing the parents talk about how tragic it was that the

8    mental health facilities or people had not been able to grasp

9    the seriousness of their son's mental illness and, so they

10   could do something that might have prevented the tragedy.

11        I make these comments because I think Mr. Endris's

12   parents should be commended for having the courage to bring to

13   the Probation Office's attention their concerns.  You may have

14   saved your son's life because if he were to stay out on the

15   street untreated, the potential for some horrendous event in

16   the future might be out there.  This combination of severe

17   mental illness and weapons is deadly.  We've seen it time and

18   time again in our society.

19        So the government is correct that that 3553(a)

20   factor, that is, concern about the safety of the community, has

21   to be a major component of this Court's sentencing decision.

22   And this is a difficult decision because I do recognize that

23   Mr. Endris is very young and does definitely have some mental

24   health issues that are definitely affecting his behavior, but I

25   can't let that excuse what's happened, and I do feel that a

1    period of incarceration that's going to keep him off the

2    streets and keep the community safe hopefully give Mr. Endris

3    some time to mature and think about what he wants to do for the

4    rest of his life, hopefully get some mental health treatment,

5    and then keep him on a very strict regime of supervised release

6    when he's released, may sufficiently address these problems

7    that we can avoid a tragedy down the road.

8           I can't lock him up for life, and I'm not going to do

9    that, but I think in this case, a sentence within the

10   guidelines is appropriate.  I'm not going to go quite as high

11   as the government is requesting, but I am going to sentence the

12   defendant in the middle of the range, to 30 months in the

13   custody of the Bureau of Prisons, with credit for the time he

14   has already served on this case.

15          I'm going to recommend that the Bureau of Prisons

16   designate him to the mental health facility at Butner, which

17   would keep him as close to this area as possible, but I will --

18   and I'm going to ask the Probation Office when they contact the

19   Bureau of Prisons to really do all you can to get this man

20   placed in a mental health facility so that he can get the

21   treatment that he does need.

22          At the completion -- after the completion of the

23   30-month prison sentence, Mr. Endris, you're going to serve

24   three years of supervised release.  The terms and conditions of

25   your supervision are first of all your uniform good behavior,

1     which means you cannot violate any federal, state, or local

2     laws while under supervision.

3           Do you understand that?

4           THE DEFENDANT: Yes, ma'am.

5           THE COURT: Secondly, you have to follow all the

6     conditions of supervision, which will be explained to you by

7     the Probation Office and will be also on your judgment order.

8     Do you understand that?

9           THE DEFENDANT: Yes.

10           THE COURT: Now, first of all, you must be drug free.

11     You will have to submit to drug testing and participate in such

12     in- or outpatient drug treatment as directed by the Probation

13     Office.

14           Do you understand that?

15           THE DEFENDANT: Yes.

16           THE COURT: The costs of the testing and treatment

17     will be waived, so that's not going to be a problem, and the

18     Court is going to require you to give up any privacy rights you

19     have to the program so the Probation Office can monitor your

20     progress.

21           Do you understand that?

22           THE DEFENDANT: Yes, I do.

23           THE COURT: Secondly, you must satisfactorily

24     participate in such mental health evaluation and treatment as

25     directed by the Probation Office. That will include

1    counseling, it may include the taking of medications, it may

2    include being in an inpatient facility, but you must fully

3    comply with any directions concerning mental health treatment.

4           Do you understand that?

5           THE DEFENDANT:  Yes, I do.

6           THE COURT:  The costs of such evaluations and

7    treatment will be waived, and you will have to give up any

8    privacy rights that you have to the mental health treatment so

9    that the Probation Office can monitor your progress.

10          Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  There's also going to be a very strict

13   restriction on your use of computers and the Internet.  You

14   will have to first of all submit to the Probation Office's

15   computer monitoring program, which means they can put devices

16   on any of your electronic equipment to make sure that you're

17   not going to any sites that you shouldn't be going to.  At any

18   time, any cell phone, any computer, any device that you use for

19   communication can be reviewed by the Probation Office, in other

20   words, you have no privacy rights, so they can make sure that

21   you're not getting involved again in, in photographs of guns,

22   in chat rooms concerning guns.

23          You're to have absolutely no communication about guns

24   or any type of weapon or any kind of soldiers of fortune, any

25   kind of publication doing with -- having to do with violence.

1          Do you understand that?

2          THE DEFENDANT:  Yes, I do.

3          THE COURT:  So if they find out that you've been

4   doing any of that -- and that also means if you go to an

5   Internet cafe and they find out that, oh, you just downloaded

6   some pictures of guns or you just had a chat with somebody

7   about weapons, you're in violation, and if you violate the

8   conditions of supervision, we can send you back to prison for

9   three more years.

10         Do you understand that?

11         THE DEFENDANT:  Yes, I do.

12         THE COURT:  All right.  Now, I'm also concerned when

13  you are, when you are released as to where you are going to be

14  able to stay.  It will be an additional condition of

15  supervision that the residence will have to be approved by

16  Probation.  We want to make sure that if your plan is to go

17  live with your parents, that your parents are comfortable with

18  the situation and that the Probation Office is comfortable with

19  the situation.

20         So you can't just go back and live where you want to

21  live.  It's going to be supervised.  Do you understand that?

22         THE DEFENDANT:  Yeah.

23         THE COURT:  I'm also going to require that you be on

24  GPS monitoring as a condition of supervision so we know where

25  you are.  I don't want you, you know, hanging around places

1    that might be a problem.

2            Do you understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  The costs for the GPS monitoring will

5    also be waived in this case.

6            And lastly, you cannot possess any type of weapon,

7    that includes knives, nunchucks, any kind of weapon at all.  Do

8    you understand that?

9            THE DEFENDANT:  Yes.

10           THE COURT:  The Court finds that given your financial

11   situation, you cannot afford the costs of incarceration, any

12   costs of supervision or the statutory fines, but the $100

13   special assessment is mandatory, and that must be paid

14   promptly.

15           I also want to advise you that since you pled not

16   guilty and you were found guilty at trial, you have a right to

17   appeal both your conviction and the sentence the Court has just

18   imposed.  If you do want to file an appeal, your notice of

19   appeal must be filed within 14 days of today's date.

20           You have the right to be represented by counsel

21   throughout your appeal.  If you do choose to appeal, I will at

22   this point reappoint the Public Defender's Office to represent

23   you on appeal.

24           And I think that concludes everything.  Is there

25   anything further the government wants the Court to add in the

1    sentence?

2           MR. GIBBS:  No, Judge, I believe you covered

3    everything that we would ask for.  Thank you.

4           THE COURT:  Was there a forfeiture in this case?

5           MR. GIBBS:  Judge, there was -- I think there was a

6    knife.

7           THE COURT:  I mean, do I need to do a forfeiture

8    order?  I don't think one was presented to us.

9           MR. GIBBS:  No, we didn't present one, Judge.  I can

10   submit one.

11          THE COURT:  Mr. Brehm, is there any issue about that?

12          MR. BREHM:  Well, I'm not sure if this is a knife

13   from the original arrest.  The government just needs to

14   communicate with me and identify what they're talking about.  I

15   can determine whether or not -- there's some personal property

16   that I think the government might have that otherwise, if it's

17   not evidentiary or contraband, we'd certainly want that

18   returned.

19          THE COURT:  Well, that could be returned to the

20   parents.  Obviously, the defendant can't take it.

21          MR. GIBBS:  I tried talking to Mr. Brehm.  I doubt

22   that a forfeiture order will be required, but we'll discuss

23   that later.

24          THE COURT:  All right.

25          MR. BREHM:  I mean, again, based on the length of

1    incarceration, if there's a knife, and I believe it might be

2    what we call a pocket knife, that could be returned to the

3    parents.  I don't see why that has to be forfeited, and I would

4    at least on the record oppose forfeiture of that.  It's not in

5    my mind related to the case or properly forfeitable property.

6             THE COURT:  Mr. Gibbs?

7             MR. GIBBS:  We can give it to the parents, Judge.

8    That's not a problem.

9             THE COURT:  All right, that's fine.  Then you've

10   worked that out.

11            And obviously, because of the problem on bond, I'm

12   not going to release the defendant pending appeal.

13            MR. BREHM:  I understand that, Your Honor.  I would

14   just make --

15            THE COURT:  Were you making that motion for the

16   record?

17            MR. BREHM:  I'll make the motion for the record --

18            THE COURT:  All right.

19            MR. BREHM:  -- and ask that he be a voluntary

20   surrender, he be released on bond pending appeal.

21            I understand your ruling, though.

22            THE COURT:  All right.

23            MR. BREHM:  There was one matter I wanted to mention.

24   You gave a number of special supervision conditions beyond the

25   normal conditions.  There's one in particular I think I need to

1    note an objection on the record.  That's the GPS monitoring.

2    Based on the length of the incarceration and the anticipation

3    that he'll benefit from some type of treatment during that

4    lengthy period as well as having numerous other stringent

5    conditions you've identified, I don't think GPS monitoring is

6    appropriate or warranted unless while he's on supervision,

7    there's actually a need for it.

8            I think if Probation feels once he's on supervision

9    that there's a need, they could raise that.  The parties could

10   address that with the Court at that time.  So at this point, I

11   would object to that condition.

12           THE COURT:  I'm going to overrule the objection.  I

13   want to start tough, and if things are looking good, then we

14   can release that condition early on.

15           But again, because part of the issue here was he left

16   the parents' home and for two days, nobody really knows where

17   he was, and so I don't know if he went to a gun store and was

18   looking at guns.  I don't know, you know, if he was casing a

19   joint, because, you know, he used to talk about robbing things.

20   I just think at this point, we need to have a sense once he

21   gets into the community as to what he's doing, and so I'm

22   overruling the objection.  I'm not aware of any legal

23   impediment to having that as a condition.

24           MR. BREHM:  Your Honor, I apologize.  One of the

25   special conditions had to do with certain things he could look

1    at, and I'm not sure if you, if you included in that a

2    condition that he not look at things that are violent or some

3    broad term like that.  I would object to the breadth and

4    vagueness of that kind of term.  I understand you mentioned

5    some things that, let's say, things that depicted firearms as

6    an example.

7              THE COURT:  Right.

8              MR. BREHM:  But any restriction that's used as a

9    broader term like, you know, "violence," we would object to

10   that because I just think that's too vague and ambiguous and

11   too likely that he might -- it's too gray an area I would

12   suggest.

13             THE COURT:  Well, I'm leaving it there, and if

14   there's a problem, in other words, if the Probation Office

15   thinks there's been a violation, we'll address it at that

16   point, but I want it made clear that the defendant needs to be

17   extremely conservative as to what sites he decides to go visit

18   when he's on the Internet.

19             All right, anything further?

20             MR. BREHM:  I don't believe so.  And I do appreciate

21   the recommendation to Butner, because that's what we were going

22   to ask for based on the length of sentence, and that is the

23   closest medical facility --

24             THE COURT:  All right.

25             MR. BREHM:  -- that we know of to the area.

1          THE COURT:  All right.  The defendant is remanded.

2          Mr. Gibbs?

3          MR. GIBBS:  Thank you, Your Honor.

4                          (Which were all the proceedings

5                           had at this time.)

6

7               CERTIFICATE OF THE REPORTER

8       I certify that the foregoing is a correct transcript of

9  the record of proceedings in the above-entitled matter.

10

11

12    _____      /s/_____

13                                   Anneliese J. Thomson

14

15

16

17

18

19

20

21

22

23

24

25